## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

**BRADLEY FOERSTER**

                **Plaintiff,**

**V**                                                  **COMPLAINT**

**UNIVERSITY OF MICHIGAN,**

**Defendant.**

---

BRADLEY FOERSTER (In Pro Per)
3507 Veralta Drive
Cedar Falls, IA 50613
Phone: (612) 354-0408
bradfoerster05@gmail.com

## TRIAL BY JURY DEMANDED
## <u>COMPLAINT</u>

NOW COMES plaintiff, BRADLEY FOERSTER, in pro per who states in support of his

complaint:

### I.  INTRODUCTION

1.  This case involves numerous civil and constitutional rights violations perpetrated through
    the University of Michigan and its various parts/departments with potential national
    security implications.

2.  The violations started after a sexual misconduct case was reported to University of
    Michigan leadership involving NIH R01 Grant NS082304 which was 3+ million dollar

1

grant funded by the NIH in 2014 and granted to the Regents of the University of Michigan (UM).  The NIH grant was the world's largest imaging trial for amyotrophic lateral sclerosis (ALS).

3.      The Co-Principal Investigators on the NIH Grant were Dr. Bradley Foerster, MD, PhD and Dr. Robert Welsh, PhD.  Professor Eva Feldman, a world renowned neurologist, was a funded Co-Investigator on the grant.  Dr. Myria Petrou, MA MBChB MS, was a non-funded Co-Investigator.  Ms. Duaa Altaee was hired as the research coordinator under the grant after unanimous decision by the investigators on the grant.

4.      In 2015, upon Dr. Feldman's recommendation, Ms. Altaee and Dr. Foerster reported Dr. Welsh to the Office of Institutional Equity (OIE), the UM Title IX office, for sexual misconduct/retaliation.

5.      The University of Michigan ran a sham investigation and committed numerous violations of Title IX.

6.      The University of Michigan later weaponized the results of the OIE investigation against Bradley Foerster's employment at the University of Michigan.

7.      For the 2015, 2016, and 2017 annual NIH reports as well as the final 2018 close-out NIH report,  Dr. Welsh documented no data analysis (and no work during 2018) despite it being a requirement of the contract.  Dr. Foerster documented his efforts for clinical recruitment, phenotyping and his data analysis as delineated under the NIH Multi-PI agreement.

8.      In July 2017, Dr. Petrou reported Dr. Welsh to the OIG for not performing any documented analysis for NIH Grant R01 NS082304.

2

9.     In October 2017, unbeknownst to Dr. Petrou or Dr. Foerster until recently, the HHS-OIG administratively closed the investigation without interviewing/informing Dr. Petrou or Dr. Foerster.

10.    In March 2018, Dr. Petrou and Dr. Foerster were interviewed by HHS-OIG Special Agent Tyson Howard and FBI Special Agent Sue Lucas at the FBI office in Ann Arbor, Michigan.  Special Agent Tyson did not show his federal badge and instead presented his business card.

11.    Shortly following, Paul Cronin, a long term colleague of Dr. Foerster's and Dr. Petrou's, was interviewed at the University of Michigan Department of Radiology after being escorted to the interview by then Radiology Vice-Chair Dr. Ella Kazerooni.

12.    In December 2017, the University of Michigan terminated Duaa Altaee despite Ms. Altaee being on approved medical leave for PTSD secondary to the sexual harassment case.

13.    In Summer 2018, Duaa Altaee, was interviewed by HHS-OIG Special Agent Tyson Howard and FBI Special Agent Sue Lucas in Washington D.C. at Duaa Altaee's flat. Duaa Altaee's description of Agent Howard did not match Dr. Foerster's or Dr. Petrou's.

14.    In September 2018, Dr. Myria Petrou resigned from the University of Michigan due to a hostile and unsafe work environment.  Dr. Petrou had also served as a witness to the sexual harassment case and participated in the OIE investigation, a fact later denied by the University of Michigan.

15.    In April 2019, the HHS informed Dr. Foerster and Dr. Petrou that it had no record of Tyson Howard working at the HHS/HHS-OIG.

16.    The University of Michigan refused to investigate the identity of Tyson Howard.

17. The HHS/HHS-OIG has no record of the March 2, 2018 interview of Bradley Foerster/Myria Petrou by HHS-OIG Agent Howard.

18. The University of Michigan, including numerous senior faculty/senior administrators, falsely claimed in 2018 and 2019 that the HHS-OIG investigation was on-going despite the investigation being administratively closed on October 5, 2017.

19. In Fall 2018, the University of Michigan weaponized the non-existing HHS-OIG investigation and the sexual harassment case and used the proceeds of numerous false witnesses to initiate unprecedented 5.09 dismissal proceedings against Dr. Foerster in an effort to discredit him and force Dr. Foerster out of the University of Michigan.  During the 5.09 proceedings, the University of Michigan violated numerous of its own ByLaws as well the U.S. Constitution.

20. Just prior to the 5.09 proceedings, the University of Michigan conducted a sting psychiatric operation against Dr. Foerster.  Dr. Foerster passed the psychiatric evaluation and unconstitutional drug test.

21. Starting in August 2016, Paul Cronin informed Dr. Foerster and Ms. Altaee that he was not trained as a physician despite being employed as a radiologist at UM.  Cronin provided extensive detail of what he claimed was a Russian scheme to subvert the 2016 U.S. Presidential Election as well as a money laundering operation in the State of Michigan. According to Cronin, Cronin did not subsequently disclose his narrative regarding the election scheme or money laundering operation to Agents Lucas and Howard when interviewed in March 2018.  Cronin also repeatedly informed Drs. Foerster and Petrou from September 2016 to July 2017 of what he claimed was a fraudulent billing scheme at the University of Michigan using EPIC.

22. Immediately following "disclosure" of Cronin's "sensitive" information,  Dr. Foerster, Dr. Petrou and Ms. Altaee found themselves victims of numerous false allegations/witnesses which were used by the Ann Arbor Police Department (AAPD) and the University of Michigan to target them.

23. Among other things, Drs. Foerster and Petrou have been falsely accused and under investigation by AAPD of "embezzling" Dr. Petrou's parents funds (despite a broad durable power of attorney under which there can be no embezzlement), "extortion" of Paul Cronin, stealing two orange cats, and cyber-bullying of Ms. Altaee's former husband for simply asking for their belongings back which he had agreed to store for them.  The false witnesses included "Nick" who was an unidentified character who claimed to be Cronin's colleague at UM.  "Nick" led the "extortion" allegation of Cronin. In 2020, Drs. Foerster and Petrou learned that Dr. Nicholas Reeser (who was a radiology fellow under Cronin at the time) appeared to be a voice match for "Nick."  When Dr. Petrou asked for an investigation of "Nick" UM Radiology Chair refused to investigate. UM ran a sham investigation into the identity of "Nick" without talking to Drs. Petrou or Foerster or Paul Cronin. Although Cronin denied any knowledge of "Nick" as well as any extortion by Drs. Foerster or Petrou at the time under oath in a deposition, Cronin will now not reply as to whether he recognizes "Nick's" voice (obtained through "Nick's" recordings which the AAPD used to continue its "investigation" after Dr. Petrou's parents dropped their allegations).

24. The University of Michigan Police have also conducted numerous secret investigations against Dr. Foerster and Dr. Petrou in an effort to discredit them.

25.   During the numerous criminal investigations for civil matters as ultimately determined by the Washtenaw County Prosecutor, the AAPD executed seven search warrants against Drs. Foerster and Petrou which froze their bank accounts ultimately resulting in the loss of their house and all of their assets.  To date, the AAPD/City of Ann Arbor has not established a probable cause file for the search warrants despite a court order to do so and in spite of Michigan Attorney General Dana Nessel informing Drs. Foerster and Petrou that such a file should exist.

26.   At the time that Cronin made his "statements" in 2016 and 2017 regarding the Russians and the money laundering, Drs. Foerster and Petrou did not know what to make of them as they sounded totally outlandish.

27.   After some of Cronin's narrative surfaced in the press, in 2018, Drs. Foerster and Petrou wrote Special Counsel Mueller and Deputy Attorney General Rosenstein regarding Cronin's statements regarding the Russian scheme to subvert the 2016 U.S. Presidential Election as it was not only bizarre but unnerving why Cronin's "statements" would match what appeared in the press months later .  Mr. Mueller and Mr. Rosenstein never replied.

28.   Paul Cronin's statements (which preceded but mirrored the Steele Dossier) regarding the Russian interference of the 2016 U.S. Presidential Election appear to be entirely fabricated and once again were used to make Dr. Foerster, Dr. Petrou and Ms. Altaee targets.

29.   The University of Michigan has refused to acknowledge whether it has copies of the Cronin Conversations regarding the 2016 U.S. Presidential Election and Russian interference.

30.  After obtaining a copy of the Mueller/Rosenstein letters, the Ann Arbor Observer published four defamatory articles against Drs. Foerster and Petrou among other things ridiculing Drs. Foerster and Petrou for writing the letters to Mr. Rosenstein and Mr. Mueller.  Following, the Ann Arbor Observer has refused to retract the defamatory articles or publish a new article based on new documentary evidence proving that the Observer's articles/statements are inaccurate.  The Ann Arbor Observer was unable to explain to a federal judge how the current online articles serve the public interest.

31.  On November 17, 2018, Dr. Foerster wrote the University of Michigan and asked UM to facilitate the release of the Cronin recordings that were in Ms. Altaee's possession given the national security implications and the concerns of personal safety for the witnesses as well as the young children. Ms. Altaee recorded a number of the Cronin conversations in 2016-2017 as the scene seemed too bizarre.  Dr. Petrou asked Ms. Altaee to keep the recordings as Dr. Petrou was concerned that the recordings were too inflammatory and she did not want them in Dr. Petrou's or Dr. Foerster's possession or anywhere close to their children.  Ms. Altaee said that she would keep the recordings and ensure the recordings were safely stored in case they were ever needed.

32.  University of Michigan ignored Dr. Foerster's request and instead prosecuted the above mentioned sham University 5.09 "investigation" against Dr. Foerster including claiming that Dr. Foerster was making false allegations regarding the NIH Grant NS82304 as well as being the source of the EPIC allegations (when the information originated from Cronin).  This is spite of documentary evidence that Dr. Welsh had not performed any data analysis and had used over $100K in NIH funds. In particular, the University violated its own ByLaws by spending over $200K on an outside attorney to prosecute

the 5.09 proceedings even though the ByLaws prohibited use of an outside attorney (UM amended its ByLaws following conclusion of the proceedings). UM falsely accused Dr. Foerster of sending out mass emails all the while refusing to release the IP addresses of the mass emails which were obtained only after the proceedings were concluded (and Dr. Foerster resigned in good standing due to a hostile work environment). The reluctantly released IP addresses proved that Dr. Foerster did not send the mass emails. Through a UM FOIA release, Dr. Foerster discovered that it was Dr. Welsh's attorney who disseminated the mass emails falsely attributed to Dr. Foerster. UM also brought out and weaponized the suppressed sham OIE investigation of Ms. Altaee against Dr. Foerster.

33. Given the hostile environment including the sham 5.09 proceedings, Dr. Foerster resigned in good standing from the University of Michigan on June 23, 2019.

34. Dr. Petrou recently received a received a memo regarding her HHS-OIG complaint dated August 21, 2019 documenting, "Discussions with the Office of the United States Attorney resulted in a declination of the criminal prosecution. The criminal case is therefore closed."

35. Based on the timeline and recently released documentation by the HHS-OIG, the University of Michigan ran a delay and blocking strategy until it could force out the main witnesses to Dr. Petrou's complaint, namely Duaa Altaee, Dr. Petrou and Dr. Foerster thereby closing down the HHS-OIG investigation into NIH R01 Grant NS082304.

36. In addition, the University of Michigan has repeatedly refused to reach a non-financial agreement with Dr. Foerster or Dr. Petrou to allow them to pursue their careers, life, liberty and happiness.

37. Instead, the University of Michigan has repeatedly interfered with employment opportunities for Dr. Foerster, Dr. Petrou and Ms. Altaee including current employment.

38. Based on available information, the University of Michigan conducted a secret/suppressed post-hoc review/investigation of Dr. Foerster's 5.09 proceedings "exonerating" Dr. Foerster and clearing him of all charges in an effort to immunize itself against future potential claims including litigation such as this but is refusing to release the document to Dr. Foerster.

## II.   JURISDICTION AND VENUE

39. The Plaintiff hereby incorporates the preceding paragraphs as if fully restated herein.

40. Plaintiff Dr. Bradley Foerster is a resident of the City of Cedar Falls, County of Black Hawk, State of Iowa.

41. Defendant University of Michigan was at all times relevant, a Michigan public institution with an address of 500 S. State Street, Ann Arbor, Michigan 48109.

42. Jurisdiction is conferred by 28 U.S.C. § 1332 given diversity of state citizenship and amount in controversy exceeding $75,000 as well as 29 U.S.C. § 2617.

43. Jurisdiction and venue are proper in this court as Defendant's principal place of business is in Ann Arbor, Michigan.

## III.   PARTIES

44. The Plaintiff hereby incorporates the preceding paragraphs as if fully restated herein.

45. Plaintiff Dr. Bradley Foerster is a board certified radiologist (for over 10 years) who prior to resigning in good standing from the University of Michigan in June, 2019 had been promoted to Associate Professor of Radiology with tenure on September, 2016 due to his national academic reputation for his scholarly efforts for ALS and chronic pain.  Dr. Foerster has secured over 4 million dollars in extramural funding and published over 40

9

reviewed articles and 40 scientific presentations.  Dr. Foerster obtained his doctorate from the Johns Hopkins University Bloomberg School of Public Health, the thesis of which provided the backbone for the NIH R01 grant described here.  Dr. Foerster has no patient complaints, malpractice claims, or criminal history.  Dr. Foerster grew up in Caro located in the thumb of Michigan, the son of a Lutheran minister.  Dr. Foerster is married to Dr. Myria Petrou from Cyprus and they have two children together a son, age 12, and a daughter, age 13. Neither Dr. Foerster nor Dr. Petrou have been married before or have other children.

46. The University of Michigan is the number one public research university in the United States with $1.48B in research expenditures.  The University of Michigan employs over 33,000 employees and has over $8B in total revenue for operating budget, one-third of the gross domestic product for Washtenaw County, Michigan.  Michigan Medicine is a top 10 best health system in the United States according to the U.S. News and World Report.

## IV.  STATEMENT OF FACTS

47. The Plaintiff Dr. Foerster hereby incorporates the preceding paragraphs as if fully restated herein.

48. Plaintiff Dr. Foerster was recruited and hired by then Chair Dr. Reed Dunnick in October 2019 as Assistant Professor of Radiology after completing his fellowship in neuroradiology at Johns Hopkins University in 2009.

49. Dr. Foerster obtained his B.S.E. in Chemical Engineering at the University of Michigan graduating summa cum laude in 1992.

50. Dr. Foerster completed his second residency (diagnostic radiology) at the University of Michigan in 2007.

51. Dr. Foerster was promoted to Associated Professor of Radiology (with tenure) on September 1, 2016 based on his national recognition for academic excellence.

52. NIH R01 Grant NS082304 was a 3+ million dollar grant funded by the NIH in 2014 and granted to the Regents of the University of Michigan (UM).

53. The grant was the largest imaging trial for amyotrophic lateral sclerosis (ALS).

54. The Co-Principal Investigators on the NIH grant were Dr. Bradley Foerster, MD, PhD and Dr. Robert Welsh, PhD.

55. Professor Eva Feldman, a world renowned neurologist, was a funded Co-Investigator on the grant.

56. Dr. Myria Petrou, MA MBChB MS, was a non-funded Co-Investigator on the grant.

57. Ms. Duaa Altaee was hired as the research coordinator under the grant after unanimous decision by the investigators on the grant.

58. In 2015, upon Dr. Feldman's recommendation, Ms. Altaee and Dr. Foerster reported Dr. Welsh to the Office of Institutional Equity (OIE), the UM Title IX office, for sexual misconduct/retaliation.

59. In addition, Ms. Altaee reported the UM Department of Radiology for retaliation/lack of due process.

60. After a year, UM OIE released to Dr. Foerster the results of the investigation into his complaint stating that there was insufficient evidence to establish a claim of retaliation.

61. The investigation was a sham as among other issues it excluded 13/17 of Dr. Foerster's pieces of evidence (including an email demonstrating that Dr. Welsh was trying to secretly obtain a key to Ms. Altaee's office).

62. UM OIE refused Dr. Foerster an appeal.

63. UM OIE never released a copy of Ms. Altaee's report to her.

64. Instead, Ms. Altaee was terminated by UM in December 2017.

65. Ms. Altaee was on medical leave for post-traumatic stress disorder (PTSD) resulting from the harassment and retaliation as documented by her physician.

66. In 2018, UM released Ms. Altaee's OIE sham investigation which among other things excluded her 10+ pieces of evidence, designated Ms. Altaee as "reportee" (when there is no designation of "reportee" under Title IX), and used a weather forecast rather than the actual weather report to label and brand Ms. Altaee as a "liar."

67. The retaliation by Dr. Welsh hindered and obstructed the execution of the NIH R01 grant.

68. In summer of 2015, senior University of Michigan administration/faculty including Dr. Daniel Clauw, Dr. Eva Feldman, Dr. Richard Cohen, Dr. Ted Lawrence, and Dr. David Pinsky recommended that Dr. Welsh be removed from the grant.

69. Dr. Dunnick initially agreed to removed Dr. Welsh and subsequently changed his mind.

70. In spite of this, Dr. Foerster and Ms. Altaee in 2015-2017 were able to enroll nearly 100 research subjects.

71. In June 2016, Dr. Welsh abruptly left UM for a faculty position at University of Utah without explanation shortly after Dr. Foerster's OIE report was released.

72. Subsequently, UM repeatedly pressured Dr. Foerster to execute a subcontract for Dr. Welsh.  Dr. Foerster deferred.

73. In the end, Dr. Dunnick assumed a "managing-PI" role and authorized over $100K in subcontract payments to Dr. Welsh/University of Utah.

74. Later, Dr. Foerster discovered that there is no managing-PI role per the NIH.

75.  Dr. Foerster informed both the University of Michigan that there is no managing-PI role but was ignored.

76.  Dr. Foerster informed also informed the University of Utah that there is no managing-PI role but was ignored.

77.  For the 2015, 2016, and 2017 annual NIH reports as well as the final 2018 close-out NIH report,  Dr. Welsh documented no data analysis (and no work during 2018) despite it being a requirement of the contract.

78.  Dr. Foerster documented his efforts for clinical recruitment, phenotyping and his data analysis as delineated under the NIH Multi-PI agreement.

79.  Starting in August 2016, Paul Cronin, informed Dr. Foerster and Ms. Altaee that he was not trained as a physician despite being employed as a radiologist at UM.

80.  Recently, Dr. Foerster has discovered through FOIA that University of Michigan had no medical school transcripts on file for Paul Cronin despite Cronin being employed as a physician at the University of Michigan.

81.  Recently, the University of Michigan, after a litigated FOIA appeal, admitted that it had no medical school transcripts on file for Paul Cronin's wife, Aine Kelly, despite Kelly employed as a physician at the University of Michigan.

82.  All prior academic transcripts are a requirement for University of Michigan Rackham School for graduate students with Paul Cronin having received on Master's degree and Aine Kelly receiving two Master's degrees from UM.

83.  In 2016-2017, Cronin provided extensive detail of what Cronin claimed was a Russian scheme to subvert the 2016 U.S. Presidential Election as well as a money laundering operation in the State of Michigan (**Exhibit A**).

84. At the time that Cronin made his statements in 2016 and 2017 regarding the Russians and the money laundering, Drs. Foerster and Petrou did not know what to make of them as they sounded totally outlandish.

85. Immediately following disclosure of Cronin's "sensitive" information, Dr. Foerster, Dr. Petrou and Ms. Altaee found themselves victims of numerous false witnesses which were used by the Ann Arbor Police Department (AAPD) and the University of Michigan to target them.

86. Now, given everything that happened and in retrospect, Paul Cronin's statements (which preceded but mirrored the Steele Dossier) regarding the Russian interference of the 2016 U.S. Presidential Election appear to be entirely fabricated and once again were used to make Dr. Foerster, Dr. Petrou and Ms. Altaee targets.

87. Starting Labor Day, 2016, and following, Paul Cronin informed Dr. Foerster and Dr. Petrou of what he claimed was a fraudulent billing scheme in the UM Department of Radiology.

88. Previously, former Assistant Professor Dr. Paula Novelli had informed Dr. Foerster and Dr. Petrou of similar fraudulent billing practices by the UM Department of Radiology.

89. Not long after, Dr. Novelli was packaged out of the University of Michigan with a $500K non-disclosure agreement.

90. In February and March 2017, Dr. Foerster and Dr. Petrou discovered that their bank accounts were frozen by search warrants executed by the Ann Arbor Police Department (AAPD) based on false allegations of embezzlement by Dr. Petrou's mother, Maria Petrou.

91. The search warrants were executed despite there being a broad power of attorney under which there could be no embezzlement as a matter of law.

92. To date, the AAPD/City of Ann Arbor has not established a probable cause file for the search warrants despite a court order to do so and in spite of Michigan Attorney General Dana Nessel informing Drs. Foerster and Petrou that such a file should exist.

93. In addition to the false "embezzlement" allegation, Drs. Foerster and Petrou have been falsely accused and under investigation by AAPD of "extortion" of Paul Cronin, stealing two stray orange cats, and cyber-bullying of Ms. Altaee's former husband for simply asking for their belongings back.

94. The AAPD ran one-sided investigations against Dr. Foerster and Dr. Petrou regarding the embezzlement, extortion, cat stealing and cyber-bullying allegations.

95. In April 2017, Maria Petrou informed the AAPD that she wished to withdraw her allegations.

96. Shortly afterwards, an unidentified character by the name of "Nick" who claimed to be a colleague of Cronin's at the University of Michigan appeared who made false criminal allegations that Dr. Foerster and Dr. Petrou were extorting Paul Cronin.

97. Subsequently, Paul Cronin repeatedly denied under oath any extortion by Dr. Foerster or Dr. Petrou.

98. In spite of Paul Cronin's denials under oath, the AAPD used "Nick's" false allegations of to maintain the freeze on Dr. Foerster's and Dr. Petrou's bank accounts sending their new house into foreclosure and ultimately Sheriff's sale.

99. As a direct result, Dr. Foerster and Dr. Petrou were evicted from their house and property at 630 and 620 Geddes Ridge, Ann Arbor, Michigan in May 2018.

100. As a result, Dr. Foerster and Dr. Petrou lost their new house and all of their assets.

101. Then UM Radiology Chair Dr. Dunnick refused to investigate the identity of "Nick" even though "Nick" had made calls from the University of Michigan Hospital switchboard (734-232-0000) to make false criminal allegations against Dr. Foerster and Dr. Petrou.

102. In fall 2017, the UM Office of General Counsel/Kara Morgenstern solicited false allegations from "Nick" and then ran a sham investigation into the identity of "Nick."

103. The UM Office of General Counsel/Kara Morgenstern never interviewed Dr. Foerster or Dr. Petrou or Paul Cronin regarding "Nick" with the investigation only revealed during Dr. Foerster's subsequent 5.09 proceedings in an effort to discredit Dr. Foerster.

104. In 2020, Drs. Foerster and Petrou learned that Dr. Nicholas Reeser (who was a radiology fellow under Cronin at the time) appeared to be a voice match for "Nick."

105. Although Cronin denied any knowledge of "Nick" as well as any extortion by Drs. Foerster or Petrou under oath in a June 2017 deposition, Cronin will now not reply as to whether he recognizes "Nick's" voice (obtained through "Nick's" recordings which the AAPD used to continue its investigation after Dr. Petrou's parents dropped their allegations).

106. In April 2017, Dr. Foerster and Dr. Petrou hired attorney Cyril Hall to represent them.

107. On July 15, 2017, Dr. Petrou informed the OIG "I have been a coinvestigator on NIH Grant R01 NS082304 at the University of Michigan.  One of the investigators (Robert Welsh, PhD) has not fulfilled their contractual obligations with the NIH and has not performed data analysis for 3+ years despite salary support for him and his assistants from the grant."

16

108. In July 2017, Dr. Foerster, Dr. Petrou, Paul Cronin and Paul Cronin's wife Aine Kelly signed a complaint to the University of Michigan Office of General Counsel (OGC) regarding concerns about the billing practices in the Department of Radiology.

109. Paul Cronin asked Dr. Foerster (given that Dr. Foerster was tenured and therefore enjoyed additional protections) to join in the complaint as Paul Cronin said he was afraid retaliation by his direct supervisor, Dr. Ella Kazerooni, who was directly named in the complaint to the UM OGC.

110. Paul Cronin dictated the letter to Dr. Petrou while Dr. Foerster was in the adjacent room.

111. Subsequently, Aine Kelly falsely claimed that Dr. Foerster wrote the complaint even though Aine Kelly was not physically present at the time.

112. On August 2, 2017, Dr. Foerster called Paul Cronin. After several minutes of conversation, Dr. Foerster asked Cronin if Cronin was impersonating a federal officer. Cronin denied impersonating a federal officer but then abruptly hung up and would not answer follow-up phone calls or texts from Dr. Foerster.

113. More recently, Dr. Petrou received information that Paul Cronin has been using a law enforcement (federal?) badge to intimidate and manipulate parties against Drs. Foerster and Petrou.

114. Given the seriousness of this, Dr. Foerster made appropriate inquiries. To date, the FBI has refused to confirm or deny if Paul Cronin is or was a federal officer/agent.

115. In August 2017, Dr. Foerster went on approved medical leave for a back injury.

116. In August 2017, Dr. Foerster was approved for FMLA by the University of Michigan for the back injury.

117. In September 2017, the Ann Arbor Veteran's Administration (VA) issued a "termination" letter to Dr. Foerster based on a fabricated AWOL charge.

118. The Ann Arbor VA is a Dean's VA under the University of Michigan.

119. The University of Michigan including Chair Dr. Dunnick and radiology HR was included in the communications regarding the "termination" letter while Dr. Foerster was on approved FMLA by the University of Michigan.

120. In October 2017, the U.S. Department of Labor informed Dr. Foerster that since the University of Michigan was Dr. Foerster's primary employer (UM assigned Dr. Foerster to work part-time at the VA, all benefits and salary raises through UM), the VA could not have "terminated" Dr. Foerster in the way that it did.

121. Following in summer of 2018, then Interim Radiology Chair Dr. Ella Kazerooni informed Dr. Foerster that per UM Deputy Counsel Kara Morgenstern that the University of Michigan had a special contract with the VA and that FMLA did not apply.

122. Later Dr. Foerster, discovered that the "termination" was never documented including never being reported to the National Practitioner Data Bank as required per VA protocol.

123. Dr. Foerster also subsequently obtained his records from the VA documenting that there was no AWOL designation ever attributed to Dr. Foerster.

124. Dr. Foerster was subsequently employed by the Iowa City VA from 2020-2021.

125. In August 2017, the University of Michigan hired outside law firm Hall Render to investigate NIH R01 Grant NS082034 and the radiology billing practices at University of Michigan.

126. On October 4, 2017, Dr. Foerster informed the University of Michigan that he was going to have back surgery would not return to work for several weeks.

127. On October 5, 2017, the HHS-OIG administratively closed Dr. Petrou's complaint without interviewing Dr. Petrou, Dr. Foerster or Ms. Altaee (**Exhibit B**).

128. Upon information and belief, the University of Michigan used Dr. Foerster's announcement of back surgery to claim that Dr. Foerster was not available and that the HHS-OIG could not therefore conduct an investigation.

129. After October 5, 2017, Dr. Petrou received phone calls from a "Tyson Howard" stating that he was an OIG agent investigating NIH R01 Grant NS082304 and wanted to come to Dr. Petrou's house to talk to her even though Dr. Petrou offered to meet him at his office.

130. In December 2017, the University of Michigan terminated the IRB for NIH R01 Grant NS082304 as Dr. Foerster was the IRB PI and was still on approved medical leave.

131. The University of Michigan refused to appoint Dr. Petrou as a substitute IRB PI on the grant even though Dr. Petrou was IRB PI for more complicated research protocols involving the same population of research subjects.

132. Despite lack of a functioning IRB, the University of Michigan continued to bill the NIH for over $100K for Grant NIH R01 NS082304 without Dr. Foerster's knowledge.

133. On January 31, 2018, Drs. Foerster and Petrou wrote Special Counsel Mueller regarding Paul Cronin's statements regarding the Russian scheme to subvert the 2016 U.S. Presidential Election (**Exhibit C**).

134. Mr. Mueller never replied.

135. On February 5, 2018, Drs. Foerster and Petrou reported the statements of Paul Cronin including the Russian meddling in the 2016 U.S. Presidential Election to Special Agent Bobbi of the Detroit FBI Field Office.

19

136. Drs. Foerster and Petrou were very clear that they were just reporting what Cronin had told them and that they were still at a loss as what to make of the entire scene but given that enough bizarre things had taken place they felt it was appropriate to report this to the FBI. FBI Special Agent Bobbi concurred.

137. In April 2018, again Drs. Foerster and Petrou suggested to Paul Cronin that it may be time for him to come forward and give information to law enforcement regarding what he knew about the Russian interference in the 2016 elections and the Russian money laundering scheme he had described months earlier.

138. Paul Cronin had previously promised to provide testimony to the appropriate authorities when the time was right.

139. Paul Cronin refused to come forward and provide testimony and specifically said that if he did that "his life would be ruined."

140. On May 18, 2018, Drs. Foerster and Petrou wrote Deputy Attorney General Rosenstein and Special Counsel Mueller regarding Cronin's statements regarding the Russian scheme to subvert the 2016 U.S. Presidential Election (**Exhibit D**).

141. Neither Mr. Rosenstein nor Mr. Mueller replied.

142. After obtaining a copy of the Mueller/Rosenstein letters, the Ann Arbor Observer published four defamatory articles against Drs. Foerster and Petrou among other things ridiculing Drs. Foerster and Petrou for writing the letters to Mr. Rosenstein and Mr. Mueller.

143. Following, the Ann Arbor Observer has refused to retract the defamatory articles or publish a new article based on new documentary evidence proving that the Observer's articles/statements are inaccurate.

144. The Ann Arbor Observer was unable to explain to a federal judge how the current online articles serve the public interest.

145. In February and March, 2018, Dr. Foerster was informed by Dean Dr. Ray Hutchinson and the Office of General Counsel that UM was transferring the NIH R01 grant to Dr. Welsh/University of Utah against Dr. Foerster's protestations and while Dr. Foerster was still on approved medical leave following two back surgeries.

146. Unbeknownst to Dr. Foerster at the time, University of Michigan signed a federal form falsely claiming that Dr. Foerster wished to transfer to the grant to Dr. Welsh/University of Utah (**Exhibit E**).

147. In Spring 2018, Dean Dr. Ray Hutchinson banned Dr. Foerster from applying for further research grants citing the "ongoing" OIG investigation as a basis.

148. UM Lead Counsel Timothy Lynch as well as others were aware that Dr. Hutchinson banned Dr. Foerster from applying for further research grants based on the OIG investigation.

149. As documented in this complaint, the OIG investigation cited by Dr. Hutchinson was administratively closed in October, 2017.

150. On March 2, 2018 on a Friday afternoon, Dr. Petrou and Dr. Foerster met with Special Agent Tyson Howard and FBI Special Agent Sue Lucas at the Ann Arbor FBI office.

151. Dr. Petrou and Dr. Foerster were escorted from downstairs by Agent Lucas in the federal building up to the FBI office and ushered into a small interview room through the back door.

152. Agent Howard never showed Dr. Foerster or Dr. Petrou his federal badge; instead Agent Howard handed them his business card.

153. Agent Howard and Agent Lucas asked only cursory questions regarding the NIH R01 grant.

154. Both agents asked numerous questions regarding Dr. Foerster's and Dr. Petrou's relationship with Ms. Altaee trying to falsely assert it was "abnormal."

155. Special Agent Tyson Howard specifically said to Dr. Foerster that "white guys" from "small towns in the thumb of Michigan" do not help young Muslim females.

156. Dr. Foerster said that in fact his family and his church taught him exactly the opposite, that you always try to help someone in need.

157. Both agents asked bizarre questions about a character "Shonda" who neither Dr. Foerster or Dr. Petrou had any knowledge of.

158. The agents informed Drs. Foerster and Petrou that the FBI would not investigate their police corruption concerns regarding the Ann Arbor Police stating that the civil federal RICO case recently filed by Drs. Foerster and Petrou and their attorney Cyril Hall precluded an FBI investigation.

159. When Dr. Foerster asked if the FBI would investigate a murder if there was a civil wrongful death suit, Agent Howard became irate and started pounding on the table.

160. Shortly after the March 2, 2018 interview, Paul Cronin was interviewed by Agents Howard and Lucas in the Department of Radiology at UM.

161. Following, Paul Cronin informed Dr. Foerster, Dr. Petrou and Ms. Altaee that he had lied to Agents Lucas and Howard.

162. According to Paul Cronin, Cronin did not disclose the election interference scheme or money laundering operation to Agents Lucas and Howard.

163. In July 2018, Ms. Altaee was interviewed by Agents Howard and Lucas after they showed up unannounced at her residence in Washington, D.C.

164. Ms. Altaee's physical description of Agent Howard did not match Dr. Foerster's or Dr. Petrou's.

165. In April and May of 2018, UM Deputy Lead Counsel Kara Morgenstern facilitated false allegations made by UM Lead Radiology Administrator Kara Morgenstern and Dean Dr. Carol Bradford to the University of Michigan Police including false allegations of bugging a statue.

166. The UM Police never informed either Dr. Foerster or Dr. Petrou of the investigations and instead involved FBI Special Agent Lucas in the investigation. FBI confirmed that there was no "bugging" of any statue.

167. In July 2018, after two back surgeries and being on approved medical leave, Dr. Foerster returned to work at the University of Michigan still on part-time disability.

168. In June and July 2018, Dr. Foerster was subjected to two psychiatric evaluations based on hearsay by then Interim Chair of Radiology Dr. Kazerooni without documentation, while on disability.

169. Dr. Foerster was also subjected to a drug test even though Dr. Foerster was informed by psychiatrist Dr. Brower that there were no concerns for drug use/abuse.

170. Subsequently, the University of Michigan has refused to release the medical record of the psychiatric interviews by Dr. Brower to Dr. Foerster.

171. In July 2018, Dr. Foerster was informed by Dr. Kazerooni, Dr. Hutchinson and Neuroradiology Division Chief Dr. Ashok Srinivasan that NIH R01 Grant NS082304 was transferred to Dr. Robert Welsh/the University of Utah.

172.  Dr. Kazerooni and Dr. Hutchinson also informed Dr. Foerster in July, 2018 that his computers were transferred to the University of Utah/Dr. Welsh without his consent.

173.  Dr. Kazerooni attempted to obtain Dr. Foerster's password to obtain access to Dr. Foerster's personal computer which was stored in his laboratory.

174.  Dr. Foerster's personal computer was never returned to him.

175.  In July 2018, Dr. Eva Feldman banned Dr. Petrou from attending the ALS clinic to recruit research patients for other ALS grants/projects citing the OIG investigation as a basis.

176.  As documented in this complaint, the OIG investigation cited by Dr. Feldman was administratively closed in October, 2017.

177.  In August 2018, upon Dr. Foerster's first day of returning to work full-time, Dr. Foerster was ambushed by Medical School Dean Dr. Carol Bradford and Dr. Kazerooni and handed a letter informing him that the University of Michigan was initiating 5.09 dismissal proceedings against Dr. Foerster (**Exhibit F).**

178.  Dean Runge's August 6, 2018 letter documented that the University of Michigan had transferred NIH R01 Grant NS082304 to the University of Utah.

179.  Once again, Dr. Foerster had implored the University of Michigan not transfer and keep the NIH R01 Grant as the grant was essential to the "Hope" of the UM ALS patients.

180.  Dean Runge's letter documented that "The University of Michigan is no longer willing to allow you to serve in a Principal Investigator or Co-Investigator role on new grants submitted to the NIH, pending the outcome of the formal Office of Inspector General investigation into the matter."

181.  As documented in this complaint, the OIG investigation cited by Dr. Runge was administratively closed in October, 2017.

182. Dr. Foerster was escorted off by security and banned from the medical campus without justification and without the appropriate documentation by the UM Department of Public Safety/law enforcement.

183. Upon information and belief, this was part of the University's scheme to prevent the renewal of the HHS-OIG investigation into NIH R01 Grant NS082304.

184. The University of Michigan retained outside attorney Daniel Tukel (Butzel Long law firm) to represent Medical School Dean Runge to prosecute the case against Dr. Foerster.

185. Dr. Foerster represented himself through the duration of the 5.09 proceedings.

186. The University of Michigan ByLaw's precluded the hiring of an outside attorney to represent Dean Runge (**Exhibit G**).

187. Following the conclusion of the 5.09 proceedings, the University of Michigan amended its ByLaws to allow for an outside attorney to represent the University.

188. In the Charge Letter, the University of Michigan/Dean Runge used the fabricated AWOL charge from the VA to justify Dr. Foerster's dismissal proceedings (**Exhibit H**).

189. In the Charge Letter, the University of Michigan/Dean Runge falsely accused Dr. Foerster of not properly administering the NIH R01 grant based on a sham unsigned investigation by Hall Render even though Dr. Foerster nursed the grant back to health after the obstruction by Dr. Welsh.

190. Specifically, the University of Michigan/Dean Runge falsely accused Dr. Foerster of improper supervision of Ms. Altaee and approval of time sheets even though Dr. Feldman had been Ms. Altaee's supervisor since summer 2016 and Dr. Feldman was signing off on Ms. Altaee's time sheets in question.

191. Specifically, the University of Michigan/Dean Runge falsely accused Dr. Foerster of an improper lapse of the IRB for the NIH R01 grant even though Dr. Foerster was on approved family leave, Ms. Altaee had documented IT issues and was unable to access the IRB renewal portal, and subsequent to submitting the IRB renewal and receiving confirmation being informed by the IRB (Ann Dillon) as well as Radiology Lead Research Coordinator Tami Harper who was in overall charge of the radiology IRBs (including the NIH R01 grant IRB) that IRB renewal submissions are not infrequently submitted late and not to worry about it.

192. Specifically the University of Michigan/Dean Runge falsely accused Dr. Foerster of significant deficiencies accord to an Office of Research Compliance Review (ORCR).

193. This was the second audit performed on the grant in six months by the same person, Dr. Sana Shakour.

194. The first audit was triggered by false allegations by former research coordinator Sara Abraham who alleged that Dr. Foerster had committed data fraud on NIH R01 Grant NS082304 and that there were missing files.

195. Sara Abraham was terminated for cause during her probationary period based on radiology HR recommendation.

196. Immediately following Sara Abraham's termination, radiology HR solicited Sara Abraham for false allegations against Dr. Foerster, Dr. Petrou and Ms. Altaee.

197. Dr. Foerster was cleared of any allegations by Dr. James Aston-Miller and Dr. Sana Shakour in the first audit.

198. To date, the University of Michigan (despite a litigated appeal) has refused to release documentation as to how the remainder of Sara Abraham's false allegations were adjudicated by the University of Michigan.

199. Dr. Shakour issued a final report for the second audit even though Dr. Foerster informed Dr. Shakour that he was on approved medical leave and could not participate in the investigation.

200. Dr. Shakour and Deputy Lead Counsel Morgenstern informed Dr. Foerster that there were missing files for the NIH grant.

201. Dr. Foerster informed both Dr. Shakour and Deputy Lead Counsel Morgenstern that prior to leaving on approved family/medical leave in summer 2017 all the research files for the NIH grant were accounted for.

202. Deputy Lead Counsel Morgenstern refused to investigate who else had access to Dr. Foerster's office where the files were located.

203. Following, Dr. Foerster discovered that Deputy Lead Counsel Morgenstern had sequestered the research files without informing Dr. Foerster.

204. Concurrently, Deputy Lead Counsel Morgenstern solicited over 20+ pieces of evidence from Dr. Foerster for a NIH investigation regarding Dr. Welsh's work effort on NIH R01 Grant NS082034.

205. Deputy Lead Counsel Morgenstern informed Dr. Foerster that she was liaising with the NIH regarding the matter and would forward the 20+ pieces of evidence to the NIH.

206. Per NIH FOIA Office, there is no record any communication by Deputy Lead Counsel Morgenstern/the University of Michigan regarding the NIH grant or the 20+ pieces of evidence submitted by Dr. Foerster.

207. In the Charge Letter,  the University of Michigan/Dean Runge falsely accused Dr. Foerster of making false allegations even though there was documentary evidence that Dr. Welsh had no documented any data analysis to the NIH despite taking >$100K (**Exhibit I, Exhibit J**).

208. In the Charge Letter,  the University of Michigan/Dean Runge falsely accused Dr. Foerster of making false allegations regarding the radiology billing even Dr. Foerster had been informed by two separate colleagues of the concerns and both colleagues informing Dr. Foerster that they had evidence.

209. Paul Cronin and Aine Kelly had both falsely informed Hall Render that Dr. Foerster was the source of the radiology billing concerns.

210. Hall Render ran a sham investigation of the radiology billing concerns with Dr. Ella Kazerooni who was named in the complaint assigned to conduct the internal investigation, a direct conflict of interest.

211. In the Charge Letter,  the University of Michigan/Dean Runge falsely accused Dr. Foerster of disseminating mass emails and personal recordings via email.

212. In the Charge Letter,  the University of Michigan/Dean Runge falsely accused Dr. Foerster of improper conduct in the judicial system even though Dr. Foerster followed his attorney Cyril Hall's advice.

213. On November 17, 2018, Dr. Foerster wrote the University of Michigan and asked UM to facilitate the release of the Cronin recordings that were in Ms. Altaee's possession given the national security implications and the concerns of personal safety for the witnesses as well as the young children (**Exhibit K**).

214. Ms. Altaee recorded a number of the Cronin conversations in 2016-2017 as the scene seemed too bizarre.  Dr. Petrou asked Ms. Altaee to keep the recordings as Dr. Petrou was concerned that the recordings were too inflammatory and she did not want them in Dr. Petrou's or Dr. Foerster's possession or anywhere close to their children.

215. Ms. Altaee said that she would keep the recordings and ensure the recordings were safely stored in case they were ever needed.

216. The University of Michigan ignored Dr. Foerster's request.

217. There were three Ad-Hoc Medical School Committee 5.09 hearings which occurred in November-December 2018.

218. Dean Carol Bradford was the Chair of the Ad-Hoc Medical School Committee.

219. Dr. Foerster brought forward attorney Cyril Hall as a witness.

220. Once again, Cyril Hall did not represent Dr. Foerster at any time during the 5.09 proceedings.

221. Cyril Hall testified that statutory construction precluded the University of Michigan from using civil litigation against Dr. Foerster.

222. Cyril Hall testified that the University of Michigan had to explicitly inform staff and faculty in its rules and regulations if it wanted to be able to use the outcomes of civil litigation against employment status.

223. Cyril Hall also documented to the Medical School Ad-Hoc Committee that Dr. Foerster had no choice but to file litigation given that there was no probable cause file for the search warrants freezing the bank accounts.

224. The University of Michigan only brought four witnesses to testify, none of which had direct knowledge of the charges against Dr. Foerster.

225. UM brought attorney David French from Hall Render who defended the fact that the Hall Render reports regarding NIH R01 grant NS082304 and the radiology billing concerns were unsigned draft reports.

226. Dr. Foerster had repeatedly requested a copy of the Hall Render reports for nearly a year since December 2017.

227. Dr. Foerster was only provided a copy of the unsigned draft Hall Render reports by Mr. Tukel, less than two weeks before the first Medical School Ad-Hoc Committee 5.09 meeting.

228. Mr. Tukel also repeatedly refused to provide Dr. Foerster with any of the other evidence prior to the Medical School Ad-Hoc Committee 5.09 meetings.

229. David French admitted that Dr. Welsh documented no data analysis for the NIH annual reports.

230. David French stated under oath that Dr. Welsh was interviewed.

231. Later, Dr. Foerster discovered that in contradistinction to Dr. Foerster's and Dr. Petrou's interviews, there were no transcripts for either Dr. Welsh's or Dr. Kazerooni's interviews by Hall Render.

232. UM brought forward Michigan Medicine Chief Information Officer Jack Kufahl who admitted that he was unsure if he could track an IP address given Dr. Foerster's statements that he did not send the mass emails or disseminate his personal recordings.

233. UM brought forward Dean Dr. Ray Hutchinson who admitted that the purpose of the spring 2016 cease and desist letter sent by Dr. Welsh to Dr. Foerster was to gag Dr. Foerster from discussing the sexual harassment case at the arbitration meeting.

234. Dr. Hutchison was a personal friend of Dr. Welsh.

235. UM was using the fact that Dr. Foerster did not participate in the arbitration meeting regarding the NIH grant subcontract against Dr. Foerster.

236. With the knowledge of Dean Hutchinson and the UM OGC, Dr. Welsh had refused to retract the cease and desist letter.

237. As such, Dr. Foerster was unable to participate in the arbitration meeting due to concerns of obstruction of justice.

238. Later, Dr. Foerster found out there were no minutes of the November, 2016 arbitration committee meeting which awarded the subcontract to Dr. Welsh.

239. It is against University of Michigan policy to conduct a formal meeting regarding a federal grant without keeping minutes.

240. In Spring 2017 after Dr. Foerster informed the University of Michigan that Dr. Welsh had not documented any analysis in the annual reports to the NIH, Dr. Welsh falsely claimed that Dr. Foerster had obstructed his access to the data from the grant in an effort to exonerate himself.

241. The arbitration committee allegedly met for a second time.

242. Once again, there are no minutes for the second arbitration committee meeting.

243. After Dr. Foerster explained to Dr. Hutchinson that he had not obstructed data analysis to Dr. Welsh, Dr. Hutchinson told Dr. Foerster that Dr. Foerster "had been very reasonable" and that Dr. Hutchinson would follow-up if he had any concerns.

244. Dr. Hutchinson never followed up with Dr. Foerster.

245. As the last of four witnesses, UM brought forward AAPD Detective Geoffrey Spickard.

246. AAPD Detective Spickard testified that cat ownership was a "criminal" matter and warranted a "criminal investigation."

247. The day after the Washtenaw County Prosecutor declined to press charges against Dr. Foerster and Dr. Petrou (on February 7, 2018), the AAPD opened a criminal investigation against Dr. Foerster and Dr. Petrou for adopting two stray orange cats the previous summer.

248. The AAPD never informed Dr. Foerster or Dr. Petrou that a formal criminal investigation was opened; Dr. Foerster discovered the criminal investigation through FOIA.

249. Stacy Markel who was a neighbor reported the two orange cats as hers even though the orange cats where starving when adopted by Dr. Foerster and Dr. Petrou and no one in the neighborhood claimed the cats when Dr. Foerster and Dr. Petrou inquired in summer of 2017.

250. Stacy Markel is affiliated with and has made donations to the University of Michigan.

251. Prior AAPD Officer Boylan had interviewed Dr. Foerster about the cats and informed Dr. Foerster that cat ownership was a civil issue.

252. The Washtenaw County Sheriff's office also concurred with AAPD Officer Boylan that cat ownership was a civil issue.

253. Attorney Cyril Hall settled the civil litigation in the 15th District Court with Chief Judge Joseph Burke presiding.

254. Paul Cronin was responsible for giving the two orange cats to the Markels through attorney Cyril Hall's office.

255. In spite of Chief Judge Burke stating that the ownership could only be proven through microchip scanning, the two orange cats given to Stacy Markel were never scanned.

256. Following the settling of the case with the Markels, Judge Burke prosecuted contempt of court proceedings against Dr. Foerster and Dr. Petrou committing numerous procedural court violations to do so.

257. Among other violations, Judge Burke never signed his order and conducted the hearing on a closed case.

258. In spite of this, the University of Michigan and Mr. Tukel used Judge Burke's flawed court proceedings against Dr. Foerster during the 5.09 proceedings.

259. University of Michigan and Mr. Tukel also used Federal Judge Sean Cox's show cause hearing decision taken out of context during the 5.09 proceedings against Dr. Foerster's employment.

260. The Judge Sean Cox show cause hearing was conducted on a closed case (**Exhibit L**).

261. Following, Dr. Foerster discovered that UM Deputy Lead Counsel Kara Morgenstern filed a complaint to LARA against Dr. Foerster and Dr. Petrou using Judge Burke's flawed court proceedings.

262. During the 5.09 proceedings, Mr. Tukel played Dr. Foerster's personal recordings between Dr. Foerster and Dr. Feldman and Dr. Foerster and Dr. Cohan without Dr. Foerster's permission.

263. Mr. Tukel would not disclose how the source of Dr. Foerster's personal recordings.

264. Paul Cronin initially agreed to testify at the 5.09 proceedings but then backed out.

265. Dr. Foerster was not allowed to compel witnesses to testify who had first-hand knowledge of the charges against Dr. Foerster even though UM Lead Counsel Timothy Lynch had previously informed Dr. Foerster that the University could compel UM employees to cooperate with an investigation.

266. The University of Michigan also refused Dr. Foerster's request to serve interrogatories for the 5.09 proceedings.

267. As a result, in its December 19, 2018 decision memorandum, the Ad-Hoc Medical School 5.09 Committee depended on hearsay evidence to make its recommendation to dismiss Dr. Foerster all the while ignoring Dr. Foerster's 150+ pieces of unrefuted evidence (**Exhibit M**).

268. In its decision memorandum, the Ad-Hoc Medical School 5.09 Committee fabricated new allegations against Dr. Foerster including "failure to properly oversee a Department of Veterans Affair (VA) Merit Award budget", "incorrect and misleading characterization of the evidence", and "failure to take responsibility for his actions."

269. In his rebuttal and appeal to the Ad-Hoc Medical School 5.09 Committee decision memorandum, Dr. Foerster documented the numerous violations of the University's own ByLaws, the U.S. Constitution, the American Disability Act, the Family Leave Medical Act and Due Process both prior and during the 5.09 proceedings (**Exhibit N**).

270. In April 2019, Drs. Foerster and Petrou discovered that the HHS-OIG had no employment record of a "Tyson Howard." (**Exhibit O**)

271. Subsequently, Dr. Foerster asked Mr. Tukel, the University of Michigan including the SACUA, Deputy Lead Counsel Kara Morgenstern, Lead Counsel Timothy Lynch to investigate as it had vetted Agent Howard to question Paul Cronin.

272. UM refused to investigate the identity of "Tyson Howard."

273. Despite Agent Howard requesting that Dr. Foerster follow-up, Agent Howard never replied to over 20 emails documenting the concerns regarding NIH R01 Grant NS082304.

274. Dr. Foerster also followed up with FBI Special Agent Sue Lucas regarding "Tyson Howard's" status but never received a reply.

275. The HHS-OIG has recently confirmed there is no record of the March 2, 2018 interview **Exhibit P).**

276. To date, the FBI has not released any record of the March 2, 2018 interview.

277. To date, no one has been able to find HHS-OIG Special Agent Tyson Howard (**Exhibit Q).**

278. In April 2019, just prior to the SACUA review hearing, a complaint was made to the UM police falsely stating that "Foerster has lost touch with reality and is suffering from mental instability."

279. Dr. Foerster was in Ann Arbor visiting his in-laws, with his wife and children, attended church for Greek Easter and had Easter lunch with family friends with no concerns.

280. The University of Michigan Police never contacted Dr. Foerster.

281. Dr. Foerster discovered the complaint through a FOIA request.

282. The University of Michigan has refused to release the identity of the witness who made the false allegations in the April 19, 2019 police complaint.

283. Instead, the University of Michigan police officer recommended extra patrols based on the false witness.

284. On May 1, 2019 the University of Michigan SACUA conducted a review hearing for the 5.09 proceedings.

285. Once again, Mr. Tukel represented Dean Runge, a violation of the 5.09 ByLaws in existence at the time.

286. Attorneys Angela Jackson and Bruce Wallace (Hooper Hathaway law firm) provided legal counsel to the SACUA, a violation of the 5.09 ByLaws in existence at the time.

287. After Mr. Tukel spent nearly one quarter of his time and efforts attacking Dr. Foerster's character over the fabricated VA AWOL charge/termination, the SACUA dismissed the VA concerns from the 5.09 proceedings as grounds for termination.

288. On May 24, 2019 The SACUA Review Committee recommended the dismissal of Dr. Foerster **(Exhibit R)**.

289. The SACUA Review Committee went on to recommend that the civil litigation not be used in the 5.09 proceedings stating, "First and foremost, Dr. Foerster's legal battles on subjects unrelated to the University should irrelevant to the serious process of dismissing a tenured faculty member.  Second, as previously discussed, reliance on Dr. Foerster's behavior civil litigation undermines the choice of procedures available applicable on to 'matters concerning primarily the medical school.'"

290. In its decision memorandum, the SACUA Review Committee dismissed the ByLaw violations as reported by Dr. Foerster (including that Mr. Tukel was not allowed to represent Dean Runge), stating that the Medical School Ad-Hoc Committee "observed the procedure prescribed in Regent's ByLaw 5.09 (4)."

291. In its decision memorandum, the SACUA Review Committee ignored the U.S. Constitutional violations and violations of the American Disability Act, the Family Medical Leave Act, and Due Process and alleged the Medical School Ad-Hoc Committee "accorded Dr. Foerster a fair hearing."

292. In its decision memorandum, the SACUA Review Committee referenced numerous pieces of the University of Michigan's hearsay evidence all the while ignoring the 200+ pieces of evidence presented by Dr. Foerster.

293. In contradistinction to the Medical School Ad-Hoc Committee which ignored the sexual harassment case altogether even though it was the lightening rod, the SACUA Review Committee weaponized the sexual harassment case against Dr. Foerster falsely stating that "Dr. Foerster's defense to the dismissal is largely based on an argument that his effort to help a colleague lodge a sexual harassment a co-investigator on their R01 grant triggered a complex, conspiratorial, and targeted retaliation campaign against him by unidentified individuals."

294. In echoes of the Salem Witch trials, the SACUA Review Committee supported the Medical School Ad-Hoc Committee's finding that Dr. Foerster's termination was justified because Dr. Foerster would not take responsibility for actions that Dr. Foerster did not commit.

295. In a further effort to discredit Dr. Foerster and in echoes of the psychiatric sting operation, the SACUA Review Committee falsely documented in its conclusion paragraph, "Dr. Foerster's sudden decline in seemingly irrational conduct" and "they [Dr. Foerster's acts and omissions] have been equally and incomprehensibly self-destructive."

296. In his May 31, 2019 rebuttal and appeal of the SACUA Review Committee's report and recommendation to President Schlissel, Dr. Foerster documented the numerous violations of the University's own ByLaws, the U.S. Constitution, the American Disability Act, the Family Leave Medical Act and Due Process both prior and during the

5.09 proceedings which occurred during both the Medical School Ad-Hoc Committee and the SACUA Review Hearing **(Exhibit S)**.

297. After discovering another SACUA hearing regarding dismissal of a UM faculty in which the faculty member was treated completely differently, Dr. Foerster wrote President Schlissel a letter on June 9, 2019 that the Medical School Ad-Hoc Committee and the SACUA Review Hearing Committee were being conducted/misconducted with the intent of a predetermined outcome **(Exhibit T)**.

298. Dr. Foerster documented to President Schlissel, "Once again the discrepancies regarding how the SACUA Faculty Hearing Committee approached and ruled on Dr. Borisov's case and how the SACUA Review Committee approached and ruled on my case are irreconcilable. The only explanation that I can provide is that I am being targeted in fact being retaliated against for reporting protected activity (both in terms of the sexual harassment case involving the NIH R01 research coordinator as well as my concerns regarding EPIC) which was admonished by the SACUA in 2009-2010 but not being condoned and propagated by the same governing body of the University."

299. In her May 31, 2019 letter to President Schlissel, Chair of the SACUA Dr. Joy Beatty stated that "SACUA considers that the dismissal process as prescribed in Regents' ByLaw 5.09 has been properly followed, and that Dr. Foerster was treated fairly and in accordance with the rules." **(Exhibit U)**.

300. In the letter, SACUA Chair Dr. Joy Beatty recommended "immediate termination of Dr. Foerster."

301. In his June 10, 2019 letter to President Schlissel, Dean Runge re-upped his false allegations against Dr. Foerster using the findings of the Medical School Ad-Hoc

Committee and the SACUA Review Hearing Committee to rubberstamp his charges **(Exhibit V)**.

302. Dean Runge disagreed with the SACUA Review Hearing Committee regarding the civil litigation issue and argued that civil litigation could be used against Dr. Foerster's employment.

303. In his June 17, 2019 memorandum, President Schlissel agreed with Dean Runge in resurrecting the civil litigation issue and used it as a basis to recommend Dr. Foerster's dismissal **(Exhibit W)**.

304. Upon information and belief, President Schlissel resurrected the civil litigation issue so that it could be used against Dr. Foerster's wife, Dr. Myria Petrou (also party to the same litigation) down the road if needed.

305. In his June 17, 2019 memorandum, President Schlissel stated that "I am satisfied that the process provided in ByLaw 5.09(4) was followed."

306. President Schlissel ignored Dr. Foerster's May 31, 2019 rebuttal and follow-up June 9, 2019 letter using the excuse that "I have reviewed the comments that Dr. Foerster made regarding his concerns with the dismissal process.  His arguments were similar in nature to the arguments he made to the Review Committee, arguments that committee concluded were either not credible or were insufficient to warrant a different recommendation."

307. The Medical School Ad-Hoc Committee, the SACUA Review Hearing Committee, Dean Runge, and President Schlissel used the fact that Dr. Foerster denied sending the mass emails to render Dr. Foerster as non-credible and dismiss Dr. Foerster's evidence.

308. After the 5.09 proceedings were concluded, the University of Michigan reluctantly released the IP addresses for the emails confirming that Dr. Foerster did NOT send the mass emails.

309. Through a FOIA request, it was revealed that Dr. Welsh's attorney had disseminated the mass emails.

310. On June 23, 2019, Dr. Foerster resigned in good standing from the University of Michigan due to a hostile work environment.

311. Following Dr.  Foerster wrote the University of Michigan Regents and Governor Gretchen Whitmer as Governor Whitmer directly oversees the University of Michigan as there is no intervening state board documenting some of the constitutional violations practiced by the University of Michigan against Dr. Foerster **(Exhibit X)**.

312. The University of Michigan Regents never replied to Dr. Foerster's concerns.

313. Governor Whitmer never replied to Dr. Foerster's concerns.

314. Following, University of Michigan has obfuscated and delayed the release of Dr. Foerster's medical records which did not document any concerns of mental instability.

315. In addition, UM has repeatedly constructively denied FOIA requests from Drs. Foerster and Petrou involving documents including but not limited to secret investigations instigated by false witnesses (e.g. "Nick", Sara Abraham), medical licensure/credentialing involving Paul Cronin and his wife Aine Kelly (also employed as a radiologists at UM), and marriage documents/certificates.

316. University of Michigan has reluctantly only released numerous FOIA requests related to Dr. Foerster and Dr. Petrou's employment including but limited to secret investigations instigated by false witnesses (e.g. "Nick", Sara Abraham) after litigated appeals.

317. To date, the University of Michigan has refused to disclose whether it not has any recordings of Paul Cronin regarding his statements of the 2016 U.S. Presidential Election.

318. To date, the University of Michigan has refused to disclose whether it not has any recordings of "Nick."

319. Further Ms. Altaee received death threats related to these matters as Mr. Lynch is aware.

320. The first death threat was in January 2018 around the time that Drs. Foerster and Petrou wrote Special Counsel Mueller.

321. The UM police mis-documented the facts of the January 2018 death threat and closed the case just after an hour of receiving the complaint.

322. In addition, Dr. Foerster has been repeatedly denied interviews and job positions for which he is clearly qualified.

323. The most recent employment denial is a neuroradiology faculty position at University of California-Irvine.

324. Dr. Foerster was offered this same faculty position at University of California-Irvine in 2016.

325. In 2016, Dr. Foerster was advised by then Radiology Chair Dr. Reed Dunnick and long term mentor Dr. Eva Feldman not to take the position at University of California Irvine as there would be better opportunities at the University of Michigan.

326. Prior in 2015 when Dr. Foerster was being recruited for neuroradiology division director at Northwestern University, Dr. Dunnick, Dr. Feldman and others advised Dr. Foerster not to take the position as there would be better opportunities at the University of Michigan.

327. In spring 2016 Dr. Foerster was offered a faculty position at Washington University but was again advised by Drs. Dunnick and Feldman not to take it as there would be better opportunities at the University of Michigan.

328. In fact, University of Michigan Professor Dr. David Pinsky who is a colleague of Dean Runge as they are both in the division of Cardiology informed Dr. Foerster that Dr. Foerster "was exactly the type of faculty that Dean Runge wanted to retain and promote."

329. In September 2017, EEOC Deputy Director Alan Anderson informed Dr. Foerster and Dr. Petrou that there "is no doubt that you are being blackballed by the University of Michigan."

330. Dr. Petrou recently received a memo through HHS-OIG FOIA dated August 21, 2019 that documenting, "Discussions with the Office of the United States Attorney resulted in a declination of the criminal prosecution.  The criminal case is therefore closed." (**Exhibit Y**).

331. Given the timing of the August 21, 2019 memo and upon information and belief, the criminal case regarding NIH R01 Grant NS082304 was closed given that Duaa Altaee, Dr. Myria Petrou and Dr. Bradley Foerster no longer worked for the University of Michigan (**Exhibit Z**).

332. Upon information and belief, the University of Michigan has conducted a suppressed/secret post-investigation/review of Dr. Foerster's 5.09 proceedings with the report completely exonerating Dr. Foerster in an effort to immunize itself from litigation such as this.

333. Despite a request, Dr. Foerster has   received no such suppressed/secret post-investigation/review of the 5.09 proceedings or any other financial compensation from

the University of Michigan since the resignation in good standing on June 23, 2019 (**Exhibit A1**).

334. In fact, the University of Michigan has repeatedly refused to reach a non-financial agreement with Dr. Foerster or Dr. Petrou to allow them to pursue their careers, life, liberty and happiness.

335. In fact, the University of Michigan has and continues to interfere with Dr. Foerster's previous, current and future employment opportunities as well as his wife's Dr. Myria Petrou's employment to discredit them and hinder their financial viability and ability to pursue civil litigation, such as the current complaint to address these issues.

336. In fact, the University of Michigan has and continues to interfere with the ability of Dr. Foerster to obtain employment in states where his family would have greater social support, such as in the State of Michigan.

337. In fact, the University of Michigan has refused to engage in any productive discussion to settle outstanding issues with Dr. Foerster, attempting to falsely brand communication with university personnel about very concrete issues as "harassment" with no basis.

338. In fact, not only will the University not engage in any meaningful discussion to settle outstanding issues, the University has engaged in a pattern of obstruction of timely FOIA requests that Dr. Foerster and Dr. Petrou have had to file to protect their employment and basic rights.

## V.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*Violation of Constitutional and Civil Rights*
*Under 42 U.S.C. 1983*

339. Plaintiff Dr. Foerster realleges and incorporates all preceding paragraphs by reference as if more fully set out herein.

340. When the events alleged in this complaint occurred, Deputy Lead Counsel Kara Morgenstern, Lead Counsel Timothy Lynch, Dean Hutchinson, Dean Bradford, Dean Runge, Dr. Ella Kazerooni, the Ad-Hoc Medical School Committee, the SACUA Review Committee, the SACUA Chair, and President Schlissel were acting within the scope of their employment.

341. When the events alleged in this complaint occurred, the University of Michigan Police were acting within the scope of their employment and under color of law.

342. At all times relevant, Defendant University of Michigan employed Deputy Lead Counsel Kara Morgenstern, Lead Counsel Timothy Lynch, Dean Hutchinson, Dean Bradford, Dean Runge, the Ad-Hoc Medical School Committee, the SACUA Review Committee, the SACUA Chair and President Schlissel and is liable for their acts.

343. At all times relevant, Defendant University of Michigan employed University of Michigan Police and is liable for their acts.

344. Defendant University of Michigan is also liable because of its policies, practices, and customs, which lead to this complaint of violation of 42 U.S.C. 1983.

345. Plaintiff Dr. Foerster's constitutional protected rights that Defendant University of Michigan violated include, but are not limited to the following:

a) The right to seek judicial redress in the courts pursuant to the First Amendment to the U.S. Constitution;

b) The right against unreasonable drug testing pursuant to the Fourth Amendment to the U.S. Constitution;

c) The rights against taking of property without due process pursuant to Takings Clause of the Takings Clause of the Fifth Amendment to the U.S. Constitution;

d) The right to fair and equal treatment guaranteed and protected by the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

e) The right to due process protected by the Fifth and Fourteenth Amendment to the U.S. Constitution;

f) The right to confront one's accusers protected by the Sixth Amendment;

g) The right to privacy, protected by the Ninth Amendment to the U.S. Constitution;

h) The right to free speech and gather, protected by the First Amendment of the U.S. Constitution;

i) The right to be licensed and employed as a practicing physician and academic; and

j) The right to life, liberty and happiness.

346. The University of Michigan, acting under color of law, violated these longstanding constitutional rights of Plaintiff Dr. Foerster by running numerous secret police investigations against Dr. Foerster.

347. The University of Michigan and its agents endorsed and furthered false allegations against Plaintiff Dr. Foerster and his wife by numerous parties who had documented financial and other incentives to pursue such false allegations without documenting or investigating conflicts of interest.

348. The University of Michigan ignored and obfuscated requests of investigation by Plaintiff Dr. Foerster and his wife which did not serve the agenda of malignant prosecution against Plaintiff Dr. Foerster and his wife and which would compromise and incriminate the false witnesses the University of Michigan employed to further an agenda of malignant prosecution.

349. The right to due process was violated by numerous parties of Defendant University of Michigan violating court rules and state statutes.

350. The right to fair and equal treatment was violated by numerous parties of Defendant University of Michigan who displayed bias towards Plaintiff Dr. Foerster and favored other parties with no justification.

351. The right to confront one's accusers were violated by not allowing Plaintiff Dr. Foerster to cross-examine critical witnesses in the 5.09 proceedings.

352. The right to privacy and right to free speech was violated by the University of Michigan obtaining Plaintiff Dr. Foerster's personal recordings without a search warrant and then using these personal recordings against Plaintiff Dr. Foerster.

353. Dr. Ella Kazerooni also attempted to illegally obtain access to Dr. Foerster's computer.

354. The right to life, liberty and happiness was violated by the University of Michigan running numerous sham investigations and suffering from multiple violations and inconsistencies.

355. The right to life, liberty and happiness was violated by the University of Michigan through destroying Dr. Foerster's reputation and violating his right to use his extensive training and abilities to pursue an academic career including taking care of patients in an

academic setting, teach students, and pursue research advances to treat fatal neurological diseases.

356. Further, the loss of Dr. Foerster's house and eviction from the house from the Plaintiff Dr. Foerster's home was directly caused and condoned by the Defendant University of Michigan through the facilitation and subsequent cover-up of "Nick" resulting in the taking of property without due process.

357. The University of Michigan also took Dr. Foerster's personal computer without due process.

358. The acts of the University of Michigan were not privileged.

359. Defendant University of Michigan, through its police department, acting under color of law, authorized, tolerated, ratified, permitted, or acquiesced in the creation of policies, practices, and customs, establishing a de facto policy of deliberate indifference to individuals such as the Plaintiff.

360. UM faculty Paul Cronin and Aine Kelly also violated Plaintiff's rights to life, liberty and happiness through making false allegations to the Ann Arbor Police via a proxy, i.e. "Nick." Through the use of a proxy, these parties also violated Plaintiff's Sixth Amendment rights to confront one's accuser.

361. Further, UM faculty Paul Cronin and Aine Kelly interfered with Plaintiff's employment and as such the Plaintiff's right to life, liberty and the pursuit of happiness in a number of ways. These included making false statements regarding Plaintiff and his wife in University of Michigan investigations, refusing to participate in University investigations to clear Plaintiff's and wife's good names, and spreading false rumors at the work environment regarding Plaintiff and his wife either directly or via proxy.

362. The University of Michigan endorsed/refused to investigate a federal agent ("Tyson Howard") used to intimidate and muzzle the Plaintiff in an effort to cover up its wrong-doing.

363. Based upon the above facts, federal agent "Tyson Howard" is presumed to be affiliated with and used as a proxy by the University of Michigan.


**SECOND CAUSE OF ACTION**
*Defamation*

364. Plaintiff Dr. Foerster realleges and incorporates all preceding paragraphs by reference as if more fully set out herein.

365. Statements by the University of Michigan and its agents were untrue when made or made in reckless disregard for the truth.

366. These malicious statements were untrue when made and painted Plaintiff Dr. Foerster in a bad light.

367. The false and malicious statements were used to prosecute Dr. Foerster's 5.09 proceedings.

368. Further, the false and malicious statements are on the public record and readily accessible.

369. As a result of these actions, Plaintiff Dr. Foerster has suffered and continues to suffer severe emotional distress, loss of employment and earnings, loss of property and severe damage to her reputation in both professional and social settings.

### THIRD CAUSE OF ACTION
#### *Fraudulent Misrepresentation*

370. Plaintiff Dr. Foerster realleges and incorporates all preceding paragraphs.

371. The University of Michigan and its agents made numerous fraudulent misrepresentations including but not limited to advising Dr. Foerster to not take/entertain outside academic employment opportunities and assuring Dr. Foerster that he would have better opportunities at the University of Michigan.

372. The University of Michigan and its agents repeatedly informed Dr. Foerster that there was an ongoing OIG investigation when the investigation was closed and concurrently using the closed OIG investigation against Dr. Foerster's employment.

373. The University of Michigan attempted to transfer the NIH R01 grant to the University of Utah and signed a federal form on Dr. Foerster's behalf and against Dr. Foerster's wishes.

374. Following, the University of Michigan informed Dr. Foerster that the NIH R01 grant was transferred to the University of Utah when it was not.

375. The fraudulent representations have resulted in extensive damages to the Plaintiff including but not limited to emotional distress, loss of property and assets, loss of employment and earnings.

### FOURTH CAUSE OF ACTION
#### *Intentional Infliction of Emotional Distress*

376. Plaintiff Dr. Foerster realleges and incorporates all preceding paragraphs.

377. Behavior and actions of Defendant University of Michigan and/or agents thereof was extreme and outrageous.

378. Said behavior by Defendant University of Michigan and/or agents thereof was intentional and reckless.

379. If said behavior by Defendant University of Michigan and/or agents was not intentional it was at least grossly negligent with malice.

380. The events above caused severe emotional distress to Plaintiff Dr. Foerster.

381. At all relevant times Defendant University of Michigan acted maliciously, recklessly, intentionally or by reason of gross negligence or violation of the law and therefore liable to Plaintiff Dr. Foerster.

382. As a direct and proximate cause of the violations listed in this Complaint, Plaintiff Dr. Foerster has suffered and continues to suffer from severe and permanent emotional distress, embarrassment, damage to his professional and personal reputation, loss of home and assets, loss of employment and earning capacity. Plaintiff Dr. Foerster is entitled to compensatory, exemplary and punitive damages.

**FIFTH CAUSE OF ACTION**
*Retaliation in Violation of the Sarbanes-Oxley Act*
*18 U.S.C. § 1514A*

383. As a separate cause and distinct cause of action, Plaintiff Dr. Foerster complains and realleges and incorporates all proceeding paragraphs by reference as if more fully set out herein.

384. At all material times Section 806 of the Sarbanes-Oxley Act of 2002 was in effect and binding on Defendant University of Michigan.  It prohibits employers such as Defendant University of Michigan from discharging, constructively discharging, demoting, threating, harassing or in a manner discriminating or retaliation against any employee

because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company/institution relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, or other violations of federal law relating to fraud.

385. Defendant University of Michigan harassed, threatened, and related against Plaintiff Dr. Foerster and disclosed his entity as whistleblower after Plaintiff made oral and written complaints regarding what he reasonably believed to be illegal or unlawful conduct in violation of federal and state statutes, rules and regulation.   Plaintiff made these complaints to his employer, by and through its agents and employees.

386. Plaintiff Dr. Foerster is informed and believes, and thereon alleges that because of his making complaints regarding Defendant University of Michigan's illegal conduct and/or conduct Plaintiff Dr. Foerster reasonably believed to be illegal, Plaintiff Dr. Foerster was discriminated and retaliated against by Defendant University of Michigan after he made the aforesaid complaint about illegal conduct and/or conduct that Dr. Foerster reasonably believed to be illegal.

387. As a direct cause and proximate result of Defendant University of Michigan's actions, Plaintiff Dr. Foerster has suffered and continues to suffer pain and mental anguish and emotional distress.

388. Plaintiff Dr. Foerster has further suffered and will continue to suffer a loss of earnings and other employment benefits, whereby Plaintiff Dr. Foerster is entitled to general compensatory damages in amounts to be proven at trial.

389. Defendant University of Michigan's actions constituted a willful violation of the afore-mentioned federal laws and regulations.   As a direct result, Plaintiff Dr. Foerster has

suffered and continues to suffer substantial losses related to loss of wages is entitled to recover costs and expenses in seeking to compel Defendant University of Michigan to fully perform its obligations under state and federal law in amounts according to proof at time of trial.

390. The conduct of Defendant University of Michigan described hereinabove was outrageous and was executed with malice, fraud, and oppression, and with conscious disregard for Plaintiff Dr. Foerster's rights, and further, with the intent, design, and purpose of injuring Plaintiff Dr. Foerster.

391. Defendant University of Michigan committed the acts alleged hereinabove by acting knowingly and willingly, with the wrongful and illegal deliberate intention of injuring Plaintiff Dr. Foerster, from improper motives amounting to malice, and in conscious disregard of Plaintiff Dr. Foerster's rights.   Plaintiff Dr. Foerster is thus entitled to recover nominal, actual, compensatory, punitive and exemplary damages in amounts according to proof at the time of trial, to the full extent allowable by law, in addition to any other remedies allowable by law.

392. As a proximate result of the actions and conduct described hereinabove, which constitutes violations of Section 806 of the Sarbanes-Oxley Act of 2002, Plaintiff Dr. Foerster has been damaged in an amount according to proof at the time of trial and seeks make whole relief, civil penalties against Defendant University of Michigan pursuant to the Sarbanes-Oxley Act of 2002.

393. Plaintiff Dr. Foerster was damaged by these actions including but not limited to, severe and permanent emotional distress, physical pain and suffering, fear, mortification, and

other damages that may be determined through discovery.  Plaintiff Dr. Foerster is entitled to compensatory, exemplary, and punitive damages.


## VI.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant for the following:

A.  An immediate injunction where no information from the University of Michigan can be used against Dr. Foerster's medical licensing and credentialing until final resolution of this case.

B.   An order declaring the conduct of the Defendant University of Michigan unconstitutional.

C.  An order for the Defendant University of Michigan to issue a public apology for its actions.

D.  An order for the Defendant University of Michigan to release any testimony and/or recordings in the University's possession given by or involving Paul Cronin as outlined in this complaint.

E.  Plaintiff Dr. Foerster prays for restoration of his academic faculty position at the University of Michigan with credit given for lost time and grade.

F.  As part of the above request, Dr. Foerster prays for restoration of his position in the ALS research team/clinic at the University of Michigan and for the University of Michigan to provide an equivalent amount of funding to grant NS 082304 towards ALS imaging research.

G.  Plaintiff Dr. Foerster prays for the restoration of ownership of his property of 630/620 Geddes Ridge, Ann Arbor, Michigan which is currently owned by faculty at the University of Michigan.

H.  Litigation/court costs reasonably incurred in this action.

I.   Award any other relief that this Honorable Court finds just and equitable.

## JURY DEMAND

**Plaintiff respectively demands a jury trial on all issues so triable.**

Dated:  September 12, 2021

_____

Bradley Foerster (In Pro Per)

3507 Veralta Drive

Cedar Falls, IA 50613

(612) 354-0408

Bradfoerster05@gmail.com

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

County in which action arose: WASHTENAW

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

BRADLEY FOERSTER

### DEFENDANTS

UNIVERSITY OF MICHIGAN

**(b)** County of Residence of First Listed Plaintiff   BLACK HAWK
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   WASHTENAW
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

BRADLEY FOERSTER

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question
    *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☒ 4  Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

### PRISONER PETITIONS

**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty

**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit (15 USC 1681 or 1692)
☐ 485 Telephone Consumer Protection Act
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC 1332 Civil Action for Fraudulent Misrepresentation under Diversity of State Citizenship and amount greater than $75K

Brief description of cause:
Civil Action for Fraudulent Misrepresentation under Diversity of State Citizenship and amount greater than $75K

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 10,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____     DOCKET NUMBER _____

DATE
September 12, 2021

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

# PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?          ☐ Yes
                                                                         ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.          Other than stated above, are there any pending or previously          ☐ Yes
            discontinued or dismissed companion cases in this or any other          ☒ No
            court, including state court? (Companion cases are matters in which
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Bradley Foerster                                          Judge: Pending assignment

PLAINTIFF

In pro per                                               Case: Pending assignment

3507 Veralta Drive

Cedar Falls IA 50613

612-3540408

bradfoerster05@gmail.com

Vs

University of Michigan

DEFENDANTS

INDEX OF EXHIBITS FOR COMPLAINT:

Exhibit A: Bradley Foerster Affidavit dated September 1 2018

Exhibit B: HHS OIG FOIA release dated July 14 2021

Exhibit C: Special Counsel Mueller letter dated January 31 2018

Exhibit D: Deputy Attorney General Rosenstein and Special Counsel Mueller letter dated May 18 2018

Exhibit E: March 12 2018 University of Michigan request to transfer NIH grant

Exhibit F: Dean Runge August 6 2018 letter initiating 5.09 proceedings regarding Dr. Bradley Foerster

Exhibit G: University of Michigan Regents 5.09 By Laws overview document

Exhibit H: Dean Runge Charge letter dated September 7 2018

Exhibit I: Final NIH grant closeout dated October 30 2018

Exhibit J: University of Utah invoice for NIH grant dated August 27 2018

Exhibit K: November 17 2018 Letter to Dr. Bradford and Ad-hoc committee

Exhibit L: March 11 2019 letter to Federal Court Judge Sean Cox

Exhibit M: December 19 2018 Ad hoc committee memorandum

Exhibit N:March 18 2019 Foerster SACUA appeal regrading ad-hoc committee decision

Exhibit O: April 10 2019 Foerster and Petrou affidavits regarding Tyson Howard

Exhibit P: August 27 2021 HHS FOIA release regarding Tyson Howard interview
Exhibit Q: Tyson Howard Business Card

Exhibit R: May 24 2019 SACUA review committee report and recommendation

Exhibit S: May 31 2019 Foerster appeal to President Schlissel

Exhibit T: June 9 2019 Foerster letter to President Schlissel

Exhibit U: May 31 2019 SACUA Chair Joy Beatty letter

Exhibit V: June 10 2019 Dean Runge recommendation and memorandum to President Schlissel

Exhibit W: June 17 2019 President Schlissel letter to SACUA chair Beatty and Foerster

Exhibit X: March 28 2020 Foerster letter to Governor Whitmer

Exhibit Y: September 1 2021 HHS FOIA release
Exhibit Z: September 2 2021 Foerster email to Timothy Lynch

Exhibit A1: September 11 2021 Foerster email to Timothy Lynch

RESPECTFULLY SUBMITTED:

September 12, 2021

Bradley Foerster

3507 Veralta Drive

Cedar Falls IA 50613

612-3540408

bradfoerster05@gmail.com